Law Offices
**CHILD & MARTON LLP**
Andrew J. Marton, State Bar No. 128140
ajmarton@childmarton.com
1055 West 7th Street, 33rd Floor Penthouse
**MAILING ADDRESS: P.O. BOX 17310**
Los Angeles, California 90017-0310
Telephone No.: (213) 627-3113 Facsimile No.: (213) 623-9237

Attorneys for Plaintiffs, LEGEND JOSIAH CROMER, LEGACY ERRINE- HELEN CROMER, KNOWLEDGE ELIJAH CROMER, SUPREME FREDDIE-LEE CROMER, DIVINITY BRIDGETTE CROMER, by and through their parent and Guardian ad Litem, FREDDIE L. CROMER, and Successor in Interest, FREDDIE L. CROMER

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEGEND JOSIAH CROMER, by and through his parent and Guardian ad Litem, FREDDIE L. CROMER, LEGACY ERRINE-HELEN CROMER, by and through her parent and Guardian ad Litem, FREDDIE L. CROMER, KNOWLEDGE ELIJAH CROMER, by and through his parent and Guardian ad Litem, FREDDIE L. CROMER, SUPREME FREDDIE-LEE CROMER, by and through his parent and Guardian ad Litem, FREDDIE L. CROMER, DIVINITY BRIDGETTE CROMER, by and through her parent and Guardian ad Litem, FREDDIE L. CROMER, and Successor in Interest, FREDDIE L. CROMER,<br><br>Plaintiffs,<br><br>vs.<br><br>DIGNITY HEALTH d/b/a CALIFORNIA HOSPITAL MEDICAL CENTER; EISNER PEDIATRIC & FAMILY MEDICAL CENTER; SOCAL | Case No.: 2:24-cv-04731-WLH-SK<br><br>**PLAINTIFFS' RENEWED NOTICE OF MOTION AND MOTION FOR REMAND; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*Declaration of Andrew J. Marton; [Proposed] Order Filed Concurrently Herewith*<br><br>Hearing Date: January 3, 2024<br>Hearing Time: 1:30 p.m<br>Ctrm: 9B<br><br>Honorable Wesley L. Hsu<br>United States District Judge<br><br><br><br>Date Filed: June 5, 2024<br>Trial Date: None |

```
 1  ANESTHESIA SOLUTIONS, INC.; IAN      )
 2  TILLEY, MD; CAMERON WILKINSON,       )
    MD; LILLIAN MORRIS, MD; THOMAS       )
 3  CACHUR, MD; PENELOPE VELASCO,        )
 4  MD; NATHANA LURVEY, MD;              )
    CONCEPTION REGACHO, MD; MOSES        )
 5  SALIBIAN, MD; OLIVIER                )
 6  URAYENEZA, M.D; SANDRA               )
    HUERTA, RN; SANDRA VELASCO RN;       )
 7  HERMINIA ESPINA RN and DOES 1        )
 8  through 50, inclusive,               )
                                         )
 9                                       )
                    Defendants.          )
10                                       )
```

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                                      PAGE

TABLE OF AUTHORITIES ................................................................................ II

NOTICE OF MOTION AND MOTION TO REMAND ................................................ III

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RENEWED MOTION TO REMAND ....................................................... 1

    I.    INTRODUCTION ................................................................................................ 1

    II.   STATEMENT OF FACTS ................................................................................... 2

    III.  LEGAL STANDARD ......................................................................................... 3

    IV.  THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE EISNER DEFENDANTS' ACTIVITIES EXCEEDED THE SCOPE OF THEIR DEEMED PHS EMPLOYMENT ............................................................................. 3

        A.   The Eisner Defendants' Hospital Activities Far Exceed Their 2007-2008 Approved Scope ................................................................................................. 4

        B.   The Systemic Failures in Oversight and Protocols Demonstrate Activities Beyond Approved Grant Scope ............................................................................. 9

           1.   The DHHS Report and Burks Medical Records Reveal Systemic Failures in Required Grant Program Oversight ....................................................................... 9

           2.   The Medical Records Reveal Uncontrolled Hospital Department Operations 10

           3.   The Totality of Evidence Establishes Operations Outside Grant Parameters .. 11

    V.   CONCLUSION .................................................................................................. 11

# TABLE OF AUTHORITIES

**Federal Cases**

." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) ........................ 3

Aguilar v. Jacobs, No. 2:24-cv-08715-MRA-MAR (C.D. Cal. filed Oct. 9, 2024) ...... 3, 4

Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992) ...................................................... 3

Provincial Gov't of Marinduque v. Placer Dome, Inc., 582 F.3d 1083, 1087 (9th Cir. 2009), cert. denied, 131 S. Ct. 65 (2010). ................................................................... 3

**Federal Statutes**

28 U.S.C. § 1441(a) ............................................................................................................ 3

28 U.S.C. § 1442(a)(1) ....................................................................................................... 1

28 U.S.C. § 1447(c) ......................................................................................................... iii

42 C.F.R. § 6.6(d) ............................................................................................................... 3

42 U.S.C. § 233 ............................................................................................................ iii, 1

42 U.S.C. § 233(g) ........................................................................................................... iii

42 U.S.C. § 233(l)(2) .......................................................................................................... 1

# NOTICE OF MOTION AND MOTION TO REMAND

**PLEASE TAKE NOTICE** that, on January 3, 2024 at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 9B of the above-entitled Court, located at 350 West 1st Street, Los Angeles, California 90012, Plaintiffs Legend Josiah Cromer, Legacy Errine-Helen Cromer, Knowledge Elijah Cromer, Supreme Freddie-Lee Cromer, Divinity Bridgette Cromer, and Freddie L. Cromer as Successor in Interest (collectively "Plaintiffs") will and hereby do move this Court for an Order remanding this action to the Superior Court of the State of California for the County of Los Angeles pursuant to 28 U.S.C. § 1447(c).

This Motion is made on the grounds that Defendants Eisner Health, Ian Tilley, M.D., Penelope Velasco, M.D., Lillian Morris, M.D. and Nathana Lurvey, M.D.'s (collectively, the "Eisner Defendants") were not acting as deemed federal employees at the time of the events of this action under 42 U.S.C. § 233(g).

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declaration of Andrew J. Marton and exhibits thereto, the pleadings and papers on file in this action, any argument and evidence presented at the hearing on this matter, and such other matters as the Court may deem appropriate.

This Motion is made following the L.R. 7-3 conference between counsel for Plaintiffs and the Eisner Defendants on November 19, 2024.

DATED: November 27, 2024        **CHILD & MARTON LLP**

By:_____
ANDREW J. MARTON
Attorneys for Plaintiffs, LEGEND JOSIAH CROMER, LEGACY ERRINE- HELEN CROMER, KNOWLEDGE ELIJAH CROMER, SUPREME FREDDIE-LEE CROMER, DIVINITY BRIDGETTE CROMER, by and through their parent and Guardian ad Litem, FREDDIE L. CROMER, and Successor in Interest, FREDDIE L. CROMER

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' RENEWED MOTION TO REMAND

## I. INTRODUCTION

This wrongful death and medical malpractice action was removed from state court by the Eisner Defendants who previously filed a Notice of Removal on June 5, 2024, asserting federal jurisdiction under 42 U.S.C. § 233(l)(2) and 28 U.S.C. § 1442(a)(1). (Notice of Removal [ECF No. 1]) In response, Plaintiffs filed a Motion to Remand on July 3, 2024, arguing that the removal was improper because the U.S. Attorney had timely appeared in the state court action and the Eisner Defendants did not qualify as federal officers under § 1442(a)(1). (Plaintiffs' Motion [ECF No. 18]). The United States also filed a Motion to Remand on June 21, 2024, on similar grounds. (USA Motion [ECF No. 13])

On October 31, 2024, this Court issued an order denying both motions to remand and gave the parties 30 days to file a renewed motion to remand on the basis that the Eisner Defendants were not acting within the scope of their deemed employment. (Order [ECF No. 31] at 7-8)

Plaintiffs now bring this renewed motion to remand to address the fundamental issue of whether the Eisner Defendants were acting within the scope of their deemed employment under the Federally Supported Health Centers Assistance Act (FSHCAA) 42 U.S.C. § 233, with respect to the events giving rise to Plaintiffs' claims. While Eisner Health has been deemed a Public Health Service employee for certain qualifying activities, the contractual arrangement between Eisner Health and Defendant California Hospital Medical Center ("California Hospital") to provide comprehensive obstetric and gynecological services at the hospital - including managing the entire OB/GYN department, staffing it 24/7/365, treating non-Eisner patients, and receiving substantial compensation - falls outside Eisner Health's federal grant project and the scope of its deemed status.

Further, the Eisner Defendants' negligent acts and omissions in treatment that caused the wrongful death of Bridgette Breana Burks at California Hospital are simply too attenuated from their core federally-funded health center activities to qualify for FSHCAA coverage. Defendants have failed to establish that their conduct was sufficiently related to Eisner Health's federal grant project and target population to fall within the scope of employment as deemed federal employees.

Accordingly, because the Eisner Defendants have not met their burden to establish federal subject matter jurisdiction, this Court should grant Plaintiffs' renewed motion to remand.

## II.   STATEMENT OF FACTS

Decedent Bridgette Breana Burks presented to the emergency room at California Hospital on March 1, 2023 and was admitted for a scheduled cesarean section delivery and tubal ligation the following day. (Compl. ¶ 28.) She was treated by Defendants Ian Tilley, M.D.; Penelope Velasco, M.D.; Lillian Morris, M.D.; and Nathana Lurvey, M.D., who are physicians employed by Defendant Eisner Health at all relevant times. (Id. ¶¶ 11-16.)

The Eisner Defendants were providing, among other things, medical services to California Hospital, a third party, pursuant to an Unassigned OB/GYN Patient Coverage and Laborist Services Agreement dated November 2022. (Id. ¶ 9.) Notably, Ms. Burks was not an Eisner Health patient but rather received her prenatal care at Watts Health Center (Compl. ¶ 28; Burks Medical Records, Ex. A at pp. 7-8), making her treatment by Eisner physicians solely a product of their hospital coverage agreement.

Dr. Velasco performed the C-section on March 2, 2023, despite allegedly lacking proper credentials to perform such procedures at California Hospital. (Id. ¶ 38.) During and after the procedure, Ms. Burks exhibited signs of hemorrhage, including low blood pressure and abnormal vital signs. (Id. ¶¶ 39(b)-(c).) Dr. Lurvey did not order necessary tests or implement appropriate interventions until after 8:00 p.m., when a DIC panel was

ordered and a second blood transfusion was initiated. (Id. ¶ 39(e).) By the time Ms. Burks was returned to surgery at approximately 9:30 p.m., over two liters of blood had accumulated in her abdomen. (Id. ¶ 39(f).) Despite emergency interventions, including multiple code blue events, Ms. Burks passed away at approximately 11:15 p.m. (Id.)

A subsequent DHHS investigation found that the facility "failed to ensure Medical staff have a copy of approved clinical privileges" and "failed to sustain the facility's performance improvement activities to ensure a safe patient outcome." (Id. ¶¶ 38-39.) These systemic deficiencies in oversight, credentials verification, and quality controls directly contributed to Ms. Burks' death. (Id.)

### III.  LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A defendant may remove an action to federal court only if the federal court would have had original subject matter jurisdiction over the suit. *See* 28 U.S.C. § 1441(a). "The removal statute is strictly construed against removal jurisdiction," and "[t]he defendant bears the burden of establishing that removal is proper." *Provincial Gov't of Marinduque v. Placer Dome, Inc.*, 582 F.3d 1083, 1087 (9th Cir. 2009), cert. denied, 131 S. Ct. 65 (2010). If there is any doubt as to the propriety of removal, federal jurisdiction must be rejected. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).

### IV.  THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE EISNER DEFENDANTS' ACTIVITIES EXCEEDED THE SCOPE OF THEIR DEEMED PHS EMPLOYMENT

The Federal regulations limit Federal Tort Claims Act ('FTCA') coverage to acts or omissions "related to the grant-supported activity" of a deemed health center. *See* 42 C.F.R. § 6.6(d).

Documents filed by Eisner Health in *Aguilar v. Jacobs*, No. 2:24-cv-08715-MRA-MAR (C.D. Cal. filed Oct. 9, 2024), demonstrate that Eisner's current comprehensive

3

management of California Hospital's OB/GYN department far exceeds the scope of activities that the Health Resources and Services Administration ('HRSA') approved in 2007-2008.

### A. The Eisner Defendants' Hospital Activities Far Exceed Their 2007-2008 Approved Scope

In 2007, Eisner Health submitted a change in scope request seeking HRSA approval to add California Hospital as a service delivery site and expand its women's health services. (Request for Judicial Notice ('RJN') in support of Renewed Motion to Remand, Ex. E [Aguilar v. Jacobs, No. 2:24-cv-08715-MRA-MAR, Motion for Certification and Substitution ('Aguilar Motion'), ECF No. 1-2, at Page ID #: 528]).  The request sought to contractually cover "... labor and delivery, the emergency room and supervising students, interns and residents for labor and delivery and gynecological procedures," with clear focus on Eisner's underserved target population. (Aguilar Motion, Ex. E at Page ID #:525-528).

HRSA approved this limited expansion in February 2008, at California Hospital, the new Service Site.  The terms and conditions identified the scope of new services as: (1) High Risk Prenatal Care; (2) Prenatal Care, and (3) Family Planning. (Aguilar Motion, Ex. G at Page ID #:581-582).

However, the Eisner Defendants' activities (that are the subject of this lawsuit) under their November 2022 Unassigned OB/GYN Patient Coverage and Laborist Services Agreement ("2022 Agreement") (Aguilar Motion, Ex. A at Page ID #: 425) with California Hospital go far beyond what HRSA approved in 2007-2008.

The 2007 request contemplated targeted services to 'broaden the spectrum of care offered to women in [Eisner's] target population.' (Aguilar Motion, Ex. E at Page ID #:528). In stark contrast, the 2022 Agreement with Eisner expands services as follows:

- 2.2 Coverage Services:

4

"(a) Eisner shall cause one (1) or more Eisner OG/GYN Physicians to be on-site on a 24 hours per day, 7 days per week, 365 days per year basis to be available to provide obstetrics and gynecology services and related medical care and treatment of Laborist Patients (the 'Coverage Services'), upon the terms and conditions set forth in this Agreement. … (b) The Coverage Services shall be provided for (i) unassigned OB/GYN patients who present for treatment to Hospital's Department or are inpatients of Hospital in need of OB/GYN services, (ii) all OB/GYN trauma and emergency patients, (iii) OB/GYN patients whose attending physician is unable to respond in time for delivery or other OB/GYN service, and (iv) patients of attending physicians that have requested OB/GYN services from the Laborist Program …" (Aguilar Motion, Ex. A at Page ID #:429).

- 2.5 Supervision Services: "Eisner shall cause qualified Eisner OB/GYN Physicians to supervise and coordinate the activities of any and all allied health professionals providing Coverage Services whether CNMs or otherwise engaged by Hospital …" (Aguilar Motion, Ex. A at Page ID #:431).

- 2.6 Medical Director Services: "Eisner shall provide and cause Nathana Lurvey, M.D., ... to serve as medical director of the Laborist Program and to perform the duties set forth in <u>Exhibit 2.6</u> (the **'Director Services'**), ... (a) Eisner shall cause the Medical Director to perform the Director Services in accordance and the Hospital Rules ... (b) Eisner shall cause the Medical Director to devote time to the Director Services as necessary and appropriate for the operation of the Laborist Program ... (c) Eisner shall cause the Medical Director to cooperate with the individual designated by the Hospital to have principal responsibility for the administration and operation of the Laborist Program, including: supervision, selection, assignment, and evaluation of personnel; maintenance of equipment; development of budgets; and acquisition of materials, supplies and equipment. (d) Eisner shall ensure that the Medical director is solely responsible for performing the Director

5

Services. ... (g) Eisner shall designate separate medical directors for each of the Laborist Program and the Ob/Gyn Training Program." (Aguilar Motion, Ex. A at Page ID #:432).

- 2.7 Residency Programs: "Hospital and Eisner shall comply with the terms and conditions set forth in <u>Exhibit 2.7</u> regarding the Residency Programs." (Aguilar Motion, Ex. A at Page ID #:432).

- Exhibit 2.2 Professional Services: "Provide on-site OB/GYN physician coverage ... for unassigned or emergent obstetric ... or gynecology patients for Hospital 24 hours per day, 365 days per year. ... For patients who have no attending physician, serve as the patients attending physician for the duration of the patient's inpatient stay .... Conduct histories and physical exams on all unassigned patients admitted while on duty .... Provide evaluation, treatment, admission, and ongoing inpatient management services to patients of private physicians .... Provide appropriate and ongoing communication with private obstetrics and gynecology physicians. Communicate timely with primary care physicians regarding follow-up needs .... Evaluate potential admissions .... Initiate and coordinate appropriate consults and transfers to higher levels of care both in Hospital and other centers. Coordinate and provide on-going management of relationships between and among Eisner Professionals, the Emergency Department, the Unit, L&D, the Hospital Staff, primary care physicians, specialists, health plans, patients, and family members, appropriate. Assist with discharge planning ... follow-up consultation with a private physician or physician group or clinic .... Assist ... in the development and clinical direction of Obstetric Emergency Department and Unit. Assist Hospital in developing and implementing appropriate clinical pathways and order sets. Participate ... in staff education and training .... Make daily rounds .... Collaborate with Hospital and participate in an annual review of the program and physicians' performance. Act as surgical assist to the staff obstetrics and gynecology physicians

upon request .... Participate in appropriate committees as reasonably requested by Hospital and/or its Chief Medical Officer." (Aguilar Motion, Ex. A at Page ID #:458-459).

- Exhibit 2.6 Director Services:  With respect to the Laborist Program, Eisner shall cause Medical Director to: Provide general administrative supervision of day-to-day operations.  Advise and assist Hospital in implementing Hospital's Rules.  Advise and assist Hospital to ensure OB/GYN physician coverage.  Participate in management development programs.  Provide ongoing appropriate management of relationships between and among Eisner Professionals, the Department, Hospital staff, primary care physicians, specialists, health plans, Laborist Patients and family members.  Advise and assist Hospital in the development and implementation of appropriate quality assurance.  Assist Hospital in the development of clinical pathways and case management.  Assist Hospital in monitoring the performance in the Laborist Program.  Participate in Hospital and Medical Staff committees.  Work with Hospital administration to timely develop annual operating and capital equipment budgets.  Provide Hospital with ongoing advice regarding strengths, weaknesses and overall quality of care.  Identify and provide industry benchmarks and trends.  Develop and review on-going training and continuing education programs.  Advise and assist Hospital to ensure full compliance with all requirements of The Joint Commission, all State licensing requirements, and all other relevant requirements promulgated by any federal, state or local agency.  Assist Hospital's management with preparation for, and conduct of, any inspections and on-site surveys of the Hospital or the Laborist Program conducted by government agencies.  Perform such other duties as may be assigned by the Hospital President, the Board of Directors and/or Community Board, as applicable, and the Chief of the Medical Staff.  (Aguilar Motion, Ex. A at Page ID #:461).

As shown hereinabove, Eisner Health has clearly undertaken to comprehensively manage and staff the OB/GYN department at California Hospital, seeing all presenting hospital patients (not just Eisner's own core underserved patient population). These provisions constitute fundamental change to a commercial arrangement as the 2022 Agreement is a commercial venture. For these services, California Hospital would pay Eisner Health substantial annual compensation of up to $3,449,250. (Aguilar Motion, Ex. A at Page ID #:467).

HRSA's Health Center Program Compliance Manual specifies that an "other line of business" arises when a health center conducts "activities that are not part of the HRSA-approved scope of project" and the "costs [and revenues] of these other activities are not included in the total budget for the Health Center Program project." *See* Health Center Program Compliance Manual, Ch. 17: Budget, available at https://bphc.hrsa.gov/compliance/compliance-manual.  The $3.45M that could be paid to Eisner (Aguilar Motion, Ex. A at Page ID #:467) represents revenues from activities beyond Eisner's core grant-supported services. (Aguilar Motion, Ex. E at Page ID #:526, 528-529; Ex. B at Page ID #:515).

In summary, the 2022 Agreement has converted Eisner's original targeted, grant-related hospital services into an independent, commercially-oriented venture as hospital department manager. Without explicit HRSA approval of this transformed scope of activities, it constitutes an impermissible "other line of business" outside deemed employment.

Indeed, Ms. Burks' case tragically illustrates this transformation. As a Watts Health Center patient with no connection to Eisner's grant-supported services (Burks Medical Records, Ex. A at pp. 7-8), her treatment by Eisner physicians stemmed solely from their role as hospital department managers. Rather than providing targeted services to its own underserved patient population as contemplated in the 2007 approval, Eisner was

operating both as the general OB/GYN department manager and primary medical provider for any presenting hospital patient - a dramatic departure from its grant-supported mission.

### B. The Systemic Failures in Oversight and Protocols Demonstrate Activities Beyond Approved Grant Scope

The extent to which Eisner has exceeded its approved grant scope is further evidenced by pervasive failures in required HRSA oversight structures and protocols. HRSA's Health Center Program Compliance Manual mandates specific oversight requirements for grant-supported activities, including "appropriate policies, procedures and systems for quality improvement/assurance" and a "clearly defined organizational structure" with "written protocols for clinical staff supervision." Health Center Program Compliance Manual, Ch. 19.D at 2, Ch. 5.A at 1. Both the DHHS Report (Declaration of Andrew J. Marton, Ex. B) and Burks Medical Records (Declaration of Andrew J. Marton, Exhibit A) demonstrate Eisner operating far outside these requirements, revealing activities that have expanded beyond permissible grant scope.

#### 1. The DHHS Report and Burks Medical Records Reveal Systemic Failures in Required Grant Program Oversight

The DHHS Report and Burks Medical Records reveal fundamental breakdowns in oversight that would not exist in a properly functioning grant-supported program. Specifically:

- Critical Lack of Clinical Governance

The "facility failed to ensure Medical staff have a copy of approved clinical privileges," allowing Dr. Velasco to perform procedures without proper credentialing documentation. (DHHS Report, Ex. B at A043, p. 1). This basic oversight failure demonstrates Eisner operations had expanded beyond the careful constraints required for grant-supported activities.

- Absent Quality Controls and Safety Systems

The facility "failed to sustain the facility's performance improvement activities to ensure a safe patient outcome" and lacked "quality resources available to sustain the facility's performance improvement activities in the prevention of maternal hemorrhage." (DHHS Report, Ex. B at A263, pp.7-9). These deficiencies show Eisner operations occurring without the structured oversight systems mandated for grant programs.

### 2. The Medical Records Reveal Uncontrolled Hospital Department Operations

The Burks Medical Records reveal a level of unstructured provider involvement incompatible with grant-supported activities:

- No Evidence of Required Protocols

When complications arose post-cesarean section, there was no implementation of the defined protocols required for grant operations. The records show Dr. Morris was simply "called by RN around 2100" when the patient deteriorated, with no systematic response process in place. (Burks Medical Records, Ex. A at p. 87).

- Critical Delays from Lack of Structure

The 90-minute delay in blood transfusion exemplifies operations beyond proper grant scope: "PRBC transfusion had not yet started, as RN and anesthesia had been trying to get labs drawn for DIC panel." (Burks Medical Records, Ex. A at p. 87). The DHHS Report itself acknowledges this failure, noting the facility "failed to ensure abnormal Vital Signs as well as signs of Hypotension and maternal hemorrhage were promptly recognized and addressed." (DHHS Report, Ex. B at A951, p.25-27).

- Fragmented Provider Response

The Burks medical records document an expanding circle of providers becoming involved without coordinated oversight:

- Dr. Wilkinson (family medicine resident) performed initial assessment (Burks Medical Records, Ex. A at pp. 7-8)

10

- Dr. Tilley supervised (id. at p.8)
- Dr. Lurvey conducted emergency surgery (Burks Medical Records, Ex. A at pp. 12-13).
- Dr. Velasco performed the C-section (Burks Medical Records, Ex. A at pp. 18-19).
- Dr. Morris managed complications (Dr. Lurvey conducted emergency surgery (Burks Medical Records, Ex. A at p.87).

### 3. The Totality of Evidence Establishes Operations Outside Grant Parameters

The complete absence of HRSA-mandated protocols, quality controls, and oversight structures - as documented by both the DHHS Report and Burks Medical Records - provides compelling evidence these activities by Eisner Defendants constituted commercial hospital operations requiring separate approval rather than grant-supported services. Furthermore, Eisner's activities expanded well beyond approved grant scope into general hospital department operations, without the careful constraints and oversight systems required for grant coverage.

The combination of DHHS Report's findings and Burks Medical Records establishes that the Eisner Defendants were operating outside the scope of grant-supported activities at the time of Ms. Burks' care. Their operations more closely resembled a general hospital department than a structured grant program with required protocols and oversight.

## V. CONCLUSION

The Eisner Defendants cannot establish federal status by relying upon a narrow 2008 approval to encompass their current extensive hospital venture. Ms. Burks' tragic case perfectly illustrates this point - she was never an Eisner patient yet received care from Eisner physicians acting as hospital department staff rather than grant-supported providers.

The 2022 Agreement reflects a material change in scope, shifting to a broad, commercially-oriented role where Eisner both manages the OB/GYN department and

provides direct patient care to all presenting patients, far beyond the limited 2007 approval which focused on Eisner's own underserved population. As HRSA's guidance and prior concerns confirm (Aguilar Motion, Ex. L at Page ID #:612-613), such a drastic transformation requires new pre-approval for FTCA coverage. Moreover, as documented extensively through both the DHHS Report and Burks Medical Records, Eisner operated without the mandatory protocols, oversight structures, and quality controls that define grant-supported activities. The systemic failures in credentialing, clinical protocols, and basic patient safety measures demonstrate operations that had expanded well beyond grant parameters into an uncontrolled commercial venture.

      FSHCAA aims to support health centers serving communities in need through carefully controlled and monitored programs. It does not provide immunity for operations that have abandoned required protocols or expanded into wide-ranging private hospital ventures absent HRSA oversight. The combination of contractual overreach, treatment of non-grant patients, and comprehensive operational deficiencies places the Eisner Defendants' activities squarely outside deemed federal employment. Permitting federal jurisdiction here would improperly expand the scope of the Act and undermine its fundamental purpose of supporting targeted healthcare delivery to underserved populations. Accordingly, Plaintiffs respectfully request that the Court remand this case to Los Angeles Superior Court for further proceedings.

      Lastly, Plaintiffs support the U.S. Government's motion for remand filed on November 26, 2024, which similarly seeks to return this case to state court. While filed separately, both motions share the fundamental goal of ensuring this matter is heard in the proper forum.

DATED:  November 27, 2024         **CHILD & MARTON LLP**

By:_____
    ANDREW J. MARTON
Attorneys for Plaintiffs, LEGEND JOSIAH CROMER, LEGACY ERRINE- HELEN CROMER, KNOWLEDGE ELIJAH CROMER, SUPREME FREDDIE-LEE CROMER, DIVINITY BRIDGETTE CROMER, by and through their parent and Guardian ad Litem, FREDDIE L. CROMER, and Successor in Interest, FREDDIE L. CROMER

## L.R.11-6.1 Certification

The undersigned, counsel of record for Plaintiffs, Legend Josiah Cromer, Legacy Errine-Helen Cromer, Knowledge Elijah Cromer, Supreme Freddie-Lee Cromer, Divinity Bridgette Cromer, and Successor in Interest, Freddie L. Cromer, certifies that this brief contains [3688] words, complies with the word limit of L.R. 11-6.1

DATED:  November 27, 2024     **CHILD & MARTON LLP**



By:_____
ANDREW J. MARTON
Attorneys for Plaintiffs, LEGEND JOSIAH CROMER, LEGACY ERRINE- HELEN CROMER, KNOWLEDGE ELIJAH CROMER, SUPREME FREDDIE-LEE CROMER, DIVINITY BRIDGETTE CROMER, by and through their parent and Guardian ad Litem, FREDDIE L. CROMER, and Successor in Interest, FREDDIE L. CROMER