1
2
3
4
5
6
7
8                UNITED STATES DISTRICT COURT
9               CENTRAL DISTRICT OF CALIFORNIA
10
11   LEGEND JOSIAH CROMER, by and        Case No. 2:24-cv-04731-WLH-SK
     through his parent and Guardian ad
12   Litem, FREDDIE L. CROMER, et al.,   **ORDER RE PLAINTIFFS' AND
                                         UNITED STATES' MOTIONS TO
13                Plaintiffs,            REMAND [38, 43]**

14   v.

15   DIGNITY HEALTH d/b/a
     CALIFORNIA HOSPITAL MEDICAL
16   CENTER, et al.,

17                Defendants.

18

19

20        This is a medical malpractice case.  Before the Court are Plaintiffs' and the

21   United States' (the "Government") Motions to Remand, respectively.  (Mots. to

22   Remand, Docket Nos. 38, 43).  The Motions are fully briefed.  The Court heard oral

23   argument on February 28, 2025, and then took the matters under submission.  For the

24   reasons explained below, the Court **GRANTS** the Government's Motion and

25   **DENIES** Plaintiffs' Motion as moot.  (Docket Nos. 38, 43).  The Court, however,

26   temporarily stays its Order to Remand for sixty (60) days to allow Defendants the

27   opportunity to move for a stay pending appeal, pursuant to their request at oral

28   argument.

# I.    BACKGROUND

## A.    **Factual Background**

This action arises from the tragic death of Bridgette Breana Burks ("Burks" or "Decedent"), mother to Minor Plaintiffs Legend Josiah Cromer ("Plaintiff LJC"), Legacy Errine-Helen Cromer ("Plaintiff LEHC"), Knowledge Elijah Cromer ("Plaintiff KEC"), Supreme Freddie-Lee Cromer ("Plaintiff SFLC") and Divinity Bridgette Cromer ("Plaintiff DBC") (collectively, "Minor Plaintiffs") and wife to Plaintiff Freddie L. Cromer ("Plaintiff FLC" or "Plaintiff Cromer") (collectively, "Plaintiffs").  (Compl., Docket No. 1 ¶¶ 1-7).  Plaintiff Cromer is the Guardian *ad Litem* to Minor Plaintiffs and is Decedent's Successor in Interest.  (*Id.* ¶ 7).

On February 29, 2024, Plaintiffs brought this action in the Superior Court of the State of California for the County of Los Angeles.[1]  Defendant physicians Ian Tilley, M.D. ("Defendant Tilley"), Penelope Velasco, M.D. ("Defendant Velasco"), Lillian Morris, M.D. ("Defendant Morris") and Nathana Lurvey, M.D. ("Defendant Lurvey") are employees of Defendant Eisner Health[2] (collectively, the "Eisner Defendants"). (*Id.* ¶ 23).  Plaintiffs allege that the negligence of the Eisner Defendants caused the death of Decedent on March 2, 2023, shortly after giving birth at California Hospital Medical Center ("California Hospital").[3]  (*Id.* ¶¶ 27-43).

### 1.  *Decedent's Treatment at California Hospital*

Plaintiffs allege that Burks arrived at California Hospital on March 1, 2023, for a scheduled cesarean section and tubal ligation.  (*Id.* ¶ 28).  Burks had been receiving prenatal care at Watts Health but presented to California Hospital for the procedure

---

[1] The Complaint attached to the Notice of Removal was an incorrectly dated copy; the correct date of filing is February 29, 2024.  (Mot. to Remand, Docket No. 13 at 6; Opp'n to Mot. to Remand, Docket No. 20 at 5).

[2] The initial Complaint erroneously named Eisner Pediatric & Family Medical Center, rather than Eisner Health.

[3] While the Eisner Defendants are not the only defendants in this matter, they are the only relevant defendants with respect to the resolution of these Motions.

where she had had a prior cesarean section.  (*Id.* ¶¶ 28, 27).  Plaintiffs do not allege that Burks was ever independently a patient of Defendant Eisner Health.

Due to a communication failure, California Hospital did not have Burks' paperwork from Watts Health, and the procedure was delayed.  (*Id.* ¶¶ 28-30).  Burks returned the next day, March 2, 2023, to undergo the procedure, which took roughly one hour.  (*Id.* ¶ 31).  Burks began to bleed heavily while in recovery, and Plaintiffs allege the Eisner Defendants "[did not] seem to know what was happening to [Burks'] condition."  (*Id.* ¶¶ 34-36).  Burks was taken back to the operating room later that night and ultimately passed away before midnight.  (*Id.* ¶ 39f).

When Plaintiff Cromer returned to California Hospital on March 3, 2023, he learned that Burks had passed away.  (*Id.* ¶ 36).  Plaintiffs allege that Defendant Velasco indicated that if they "wanted to find out what happened to [Burks], [Plaintiff Cromer] must sign a consent form for an autopsy" to be performed by California Hospital.  (*Id.*).  This allegedly avoided an independent autopsy by the Los Angeles County Medical Examiner.  (*Id.* ¶ 37).

Plaintiffs allege that the Eisner Defendants committed serious errors leading to Burks' death, including failing to recognize her as a high-risk patient, mismanaging her care during and after the procedure and generally failing to adhere to best practices.  (*Id.* ¶ 39).  Burks' medical records indicate that Defendant Tilley was the attending doctor; Defendant Velasco performed the cesarean section; Defendant Morris provided post-cesarean recovery care with Defendant Velasco; and Defendant Lurvey performed the emergency surgery with Defendants Velasco and Morris. (Decl. of Ryan C. Chapman in Supp. of Mot. to Remand ("Chapman Decl."), Docket No. 38-1 ¶ 3(a), Exhibit A).

The California Department of Public Health ("CDPH") later conducted an investigation and issued a Statement of Deficiencies and Plan of Correction to California Hospital.  (Chapman Decl. ¶ 4, Exhibit D).  The CDPH concluded that California Hospital had failed to recognize "the signs of bleeding or

hemorrhage . . . and provide appropriate care after having a Cesarean section." (*Id.* at 3).  Under California law, this amounts to "an immediate jeopardy," which is a "situation in which the licensee's noncompliance with one or more requirements of licensure has caused, or is likely to cause, serious injury or death to the patient." (*Id.* at 23); Cal. Health & Safety Code § 1280.3(h).

### 2. *Defendant Eisner Health's Arrangement with California Hospital*

Defendant Eisner Health is the recipient of a federal grant under 42 U.S.C. §254b.  (Chapman Decl. ¶ 3(b), Exhibit B).  Also known as Section 330 of the Public Health Service Act ("PHSA"), this provision provides federal public funding to health centers that "serve[] a population that is medically underserved . . . by providing . . . required primary health services . . ."  42 U.S.C. § 254(b).  Pursuant to this federal grant, Defendant Eisner applied to be "deemed" a federal employee for purposes of malpractice liability, as more thoroughly explained below.  (Chapman Decl. ¶ 3(c), Exhibit C).  This deemed status, determined by the Secretary of the Department of Health and Human Services ("HHS"), is valid for one calendar year. (*Id.*).  Defendant Eisner Health's approved deemed status ran from January 1, 2023, through December 31, 2023.  (*Id.*).

California Hospital entered into an agreement in 2022 with Defendant Eisner Health, with Defendant Eisner Health acting as an independent contractor for California Hospital.  (Chapman Decl. ¶ 5, Exhibit E §§ 2.2, 4.2).  Much of their arrangement revolves around California Hospital's Laborist Program, which ensures staffing and coordination of OB/GYN services to California Hospital patients either whose attending physician is unavailable to respond in time for delivery or who do not have an attending physician already at California Hospital.  (*Id.* ¶ 5, Exhibit E § Recitals(D)).

The contract establishes "appropriate and effective means" to facilitate and administer California Hospital's OB/GYN training and programming, "ensure efficient operation" of California Hospital's other departments and services, ensure

OB/GYN services are available for California Hospital patients, reduce disruptions in California Hospital's operations and "promote participation" in its educational programs. (*Id.* ¶ 5, Exhibit E § Recitals(G)). In exchange for Defendant Eisner Health's provision of physicians and services, California Hospital was to make a payment capped at $1,149,750 per year. (*Id.* ¶ 5, Exhibit E § 5.1(a)).

Under the contract, Defendant Eisner Health's employees were to work at California Hospital (herein, "Eisner Professionals") and provide treatment to patients in the Laborist Program.[4] (*Id.* ¶ 5, Exhibit E § 2.2(b)). To that end, Defendant Eisner Health was expected to provide its physicians "to be on-site on a 24 hours per day, 7 days per week, 365 days per year basis to be available to provide obstetrics and gynecology services and related medical care and treatment . . . (the "***Coverage Services***"), upon the terms and subject to the conditions set forth in this Agreement." (*Id.* ¶ 5, Exhibit E § 2.2(a)) (emphasis in original). It is unclear from the terms of the contract whether it was required that Eisner Professionals were physicians who presently or even formerly worked at Defendant Eisner Health; rather, it merely states that Defendant Eisner Health was required to "employ or otherwise engage Eisner Professionals to furnish Services under this Agreement . . ." (*Id.* ¶ 5, Exhibit E § 2.4(a)). Eisner Professionals were, however, expected to "dedicate substantially all of their respective professional efforts as Eisner Professionals to the provision of services at [California Hospital]." (*Id.*). Significantly, in exchange for running the Labor Department, Defendant Eisner Health did not seek the right to refer Eisner patients to California Hospital; rather, the contract explicitly states that it does not "contemplate[] or require[] the admission or referral of any patients . . ." (*Id.* ¶ 5, Exhibit 5 § 4.3(a)).

---

[4] Laborist Program patients include those "who present for treatment to [California Hospital]," including any emergency or trauma patients, as well as any OB/GYN patients whose attending physician is unavailable or has requested services from the Laborist Program. (*Id.* ¶ 5 & Exhibit E § 2.2(b)).

1    All Eisner Professionals were expected to use California Hospital's electronic

2    health record system, follow all California Hospital rules and bylaws and comply with

3    its standards and protocols.  (*Id.* ¶ 5 & Exhibit E §§ 2.9, 2.11, 2.11, 2.14).  All records

4    were to remain the "sole property of [California Hospital]."  (*Id.* ¶ 5, Exhibit E § 2.9).

5    An Eisner Professional was required to serve as the Medical Director of the Laborist

6    Program, who was similarly expected to perform her services "in accordance with

7    [California Hospital] Rules" and the "Medical Staff Bylaws[.]"  (*Id.* ¶ 5, Exhibit E

8    § 2.6).

9    The contract goes beyond the provision of OB/GYN services.  Defendant

10    Eisner Health was also required to operate California Hospitals' residency program, in

11    which new doctors are trained.  (*Id.* ¶ 5, Exhibit E at Exhibit 2.7).  More specifically,

12    Defendant Eisner Health was required to supervise the residents, provide teaching

13    services and perform evaluations.  (*Id.*).

14    **B.    Procedural Background**

15    The procedural history is drawn primarily from the Court's Order on October

16    31, 2024, in which it denied both previous motions to remand.  (Order, Docket No.

17    31).  On May 24, 2024, the Attorney General (through the local United States

18    Attorney) made a "limited appearance to advise [the Los Angeles Superior Court] that

19    whether [the Eisner Defendants] are deemed to be employees of the Public Health

20    Service for purposes of 42 U.S.C. § 233 with respect to the actions or omissions that

21    are the subject of the above captioned action, is under consideration."  (Notice to State

22    Court, Docket No. 13-4 at 117).  On June 5, 2024, the Eisner Defendants removed the

23    case to this Court.  (Notice of Removal, Docket No. 1).

24    On June 21, 2024, the Government filed a motion to remand.  (Mot. to Remand,

25    Docket No. 13).  On July 3, 2024, Plaintiffs also filed a motion to remand.  (Mot. to

26    Remand, Docket No. 18).  On September 6, 2024, and September 9, 2024, the parties

27    provided the Court with supplemental authority following the Ninth Circuit's

28    decisions in *A.H. v. Khalifa*, 2024 WL 4119690 (9th Cir. Sept. 9, 2024) and *Blumberg*

6

*v. Tilley*, 115 F.4th 1113 (9th Cir. 2024).  (Supplemental Authority, Docket Nos. 28, 29).  The Court took the matter under submission on August 21, 2024 (Docket No. 27) and issued its Order on October 31, 2024.  (Order, Docket No. 31).  The Court denied both motions in light of the intervening Ninth Circuit decision in *Blumberger v. Tilley*, 115 F.4th 1113 (9th Cir. 2024).  (*Id.* at 3-8).  The Court, however, also granted the parties "30 days from [the] Order to move to remand the case on the basis that the Eisner Defendants were not acting within the scope of their employment."  (*Id.* at 8).

On November 26, 2024, the Government filed the Motion to Remand before the Court.  (Mot. to Remand, Docket No. 38).  On November 27, 2024, Plaintiffs filed their Motion to Remand now before the Court.[5]  (Mot. to Remand, Docket No. 43).  On December 11, 2024, the Eisner Defendants filed an *ex parte* application (the "EPA") to continue the hearing on those Motions from January 3, 2025, to February 28, 2025. (Docket No. 55).  On December 13, Plaintiffs and the Government filed oppositions (Docket Nos. 56, 57), but the Court ultimately granted the application on December 16, 2024.[6]  (Order, Docket No. 60).  On February 28, 2025, the Court heard oral argument and took  the matters under submission.

---

[5] The Eisner Defendants argue that Plaintiffs failed to properly meet-and-confer, in violation of Local Rule 7-3.  (Opp'n to Mot. to Remand, Docket No. 59 at 9).  The Court, however, is not persuaded that Plaintiffs violated Local Rule 7-3 and, accordingly, declines to deny the Motion on these grounds.

[6] The Eisner Defendants had already submitted their opposing briefs on December 13, 2024, before the Court's ruling on the EPA.  (Opp'n to Mot. to Remand, Docket Nos. 58, 59).  On February 5, 2025, the Government filed its reply brief.  (Reply, Docket No. 70).  Subsequently, without seeking leave of court, or withdrawing the previously filed oppositions, the Eisner Defendants filed a second round of opposition briefs on February 7, 2025.  (Docket Nos. 71, 72).  The Court ordered these briefs stricken, for failure to comply with Local Rule 7-9.  (Docket No. 74).  The Eisner Defendants filed a second EPA ("EPA 2") on February 18, 2025, seeking to withdraw and replace their opposition briefs with those filed on February 7, 2025.  (EPA 2, Docket No. 76).  The Court denied EPA 2, but accepted the exhibits attached to the second round of opposition briefs for consideration as part of the record.  (Order, Docket No. 81). Accordingly, those exhibits were considered when ruling on these Motions.

1  **II.    DISCUSSION**

2      Before the Court are Plaintiffs' and the Government's renewed Motions to

3  Remand.  (Docket Nos. 38, 43).  The Motions are fully briefed.  For the reasons more

4  thoroughly explained below, the Court **GRANTS** the Government's Motion.

5  Plaintiffs' Motion is **DENIED** as moot.[7]

6      **A.    Legal Standard**

7      "Federal courts are courts of limited jurisdiction."  *Kokkonen v. Guardian Life*

8  *Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A defendant may remove an action to

9  federal court only if the federal court would have had original subject matter

10  jurisdiction over the suit.  *See* 28 U.S.C. § 1441(a).

11      Whether the instant action is properly before this Court turns on whether the

12  Government is the proper defendant under the Federal Tort Claims Act (the "FTCA").

13  *See* 42 U.S.C. § 233(c).  The Federal Tort Claims Act ("FTCA") acts as a limited

14  waiver to this sovereign immunity, allowing the United States to be sued for certain

15  torts committed by federal employees acting within the scope of their employment.

16  *Brown v. King*, 592 U.S. 209, 212 (2021) (quoting *Meyer*, 510 U.S. at 475-76).  "The

17  FTCA's waiver of sovereign immunity is strictly construed in favor of the sovereign,

18  and we may not enlarge its waiver beyond what the statute requires."  *FDIC v. Craft*,

19  157 F.3d 697, 707 (9th Cir. 1998).  Such claims must necessarily be adjudicated by

20  district courts.  *See* 28 U.S.C. § 1346(b).

21      **B.    Analysis**

22      The Court begins by addressing the relevant statutory scheme, which

23

24  [7] The Court finds that Plaintiffs' Motion fails to address the critical issues raised by
25  the Government that demonstrate the Court's lack of subject matter jurisdiction.
   Instead, both Plaintiffs' and Defendants' arguments focus entirely on the scope of
26  grant-related activities, which is not the threshold issue here.  Accordingly, the Court
   **DENIES** Plaintiffs' Motion as moot.  At oral argument, Plaintiffs requested that the
27  Court rule on Plaintiffs' Motion alongside the Government's.  The Court denies this
   request, as it would not appear to make a difference legally and, therefore, would not
28  be an efficient use of judicial resources.

demonstrates that the inquiry does not end at Defendant Eisner Health's "deemed" status.  Rather, the pertinent question is whether the treatment of Decedent – borne from the arrangement between Defendant Eisner Health and California Hospital – is covered conduct under the Federally Supported Health Centers Assistance Act (the "FSHCAA"), such that FTCA coverage is extended to the Eisner Defendants.  The Court concludes that because the conduct did not occur in the scope of employment for purposes of the FSHCAA – due to Decedent's status as a "nonpatient" whose treatment did not meet the required conditions for coverage – this court lacks subject matter jurisdiction.  This necessitates remand.  *See* 42 U.S.C. § 233(c).  For the reasons explained below, the Court **GRANTS** the Government's Motion to Remand and **DENIES** Plaintiffs' Motion to Remand as moot.  (Docket Nos. 38, 43).

*1.  Relevant Statutory Scheme Demonstrates Defendant Eisner Health's "Deemed" Status Does Not Conclusively Establish FTCA Coverage*

This matter finds itself entangled within "the thicket" that is 42 U.S.C. § 233. *See Blumberger*, 115 F.4th at 1126 ("[W]e return to the thicket of § 233. It is hardly a model of clarity, so we proceed with caution . . .").  The Court, accordingly, first outlines the relevant statutory scheme, which is drawn heavily from its Order on October 31, 2024, originally denying the motions to remand.  (Order, Docket No. 31). It bears repeating here.

The United States Public Health Service ("PHS") is a federal uniformed service within the Department of Health and Human Services ("HHS").  *Blumberger*, 115 F.4th at 1117.  "When an employee of the PHS is sued for medical malpractice arising from acts or omissions within the scope of his employment, the United States is substituted as the defendant, and the malpractice action proceeds against the government under [the FTCA], 28 U.S.C. §§ 1346, 2671-80." *Id.*  This remedy, which is "exclusive of any other civil action or proceeding" provides "absolute immunity to PHS officers and employees for actions arising out of the performance of

9

medical or related functions within the scope of their employment." *Id.* (quoting *Hui v. Castaneda*, 559 U.S. 799, 806 (2010)); *see* 42 U.S.C. § 233.

To entice medical providers to join federally funded health centers, Congress enacted the FSHCAA, codified at 42 U.S.C. § 233(g)-(n). *Blumberger*, 115 F.4th at 1117. Under the FSHCAA, federally funded health centers, as well as the employees of those centers, "can be 'deemed' federal employees of the PHS for the purposes of malpractice liability." *Id.* This involves applying to the Secretary of HHS for a deeming determination. *Id.* at 1118.

"The deeming decision is highly consequential for a[] [Federally Qualified Health Center ("FQHC")] because it makes it unnecessary to purchase liability insurance for many types of claims." *Kelley v. Franklin County Rehab Center* ("*Kelley I*")*, LLC*, No. 5:21-cv-278, 2023 WL 2529926, at *6 (D. Ver. Feb. 9, 2023); *see also Blumberger,* 115 F.4th at 1124-25 ("Congress enacted the FSHCAA to prevent these community health centers from having to use their federal funds to purchase costly medical malpractice insurance, which is 'one of the most significant expenses for health centers'") (quoting H.R. Rep. No. 104-398, at 5 (1995)). When plaintiffs sue "deemed employees" for actions taken within the scope of their employment, the Government is "similarly substituted as the defendant and the action proceeds as an FTCA suit," as described above. *Blumberger*, 115 F.4th at 1117. The Secretary's deeming decision means the entity and its employees "are deemed PHS employees for one calendar year." *Id.*

Although the Secretary's deeming decision is "generally 'final and binding upon the Secretary and the Attorney General,'" the decision "does not automatically immunize a covered entity or employee from a particular malpractice suit." *Id.* (quoting 42 U.S.C. § 233(g)(1)(F)); *see also Azar I*, 2019 WL 4390563, at *3 ("This [deeming] determination, although a prerequisite for FTCA immunity, does not itself confer FTCA [immunity] upon any particular defendant for any lawsuit"); *Thomas v. Phoebe Putney Health System, Inc.* ("*Thomas*"), No. 1:18-cv-096, 2019 WL 6039976,

10

at *3 (M.D. Ga., Mar. 6, 2019) (same); *Blumberger,* 115 F.4th at 1132 (". . . [M]ere deeming status does not guarantee coverage"); *Pediatric & Fam. Med. Found. v. U.S. Dep't of Health & Human Servs.* ("*Azar II*"), No. 2:17-cv-00732, 2020 WL 321833, at *6 (C.D. Cal. Mar. 10, 2020) ("The deeming determination provides FTCA immunity to health centers when personnel act within the approved scope of the project, providing services to patients and in certain circumstances, non-health center patients"). "Instead, to be eligible for FTCA immunity, the 'act or omission [giving] rise to the claim' must also have occurred while the defendant was 'acting within the scope of his office or employment.'" *Blumberger*, 115 F.4th at 1117. (quoting 42 U.S.C. § 233(a)); *see also* 42 U.S.C. § 233(g). Only when the act or omission occurred within the scope of a defendant's federal employment[8] "must the Attorney General defend a civil action against [the] deemed employee." *Id.* The status of the individual who received treatment – as either a "patient" or a "nonpatient" of the entity – is a critical aspect of that the scope of employment analysis, as explained more thoroughly below, given that the deemed status only applies in limited situations to treatment of individuals who are *not* patients of the entity. *Id.* § 233(g)(1)(B); *see, e.g., Kelley v. Richford Health Center, Inc.,* ("*Kelley II*"), 115 F.4th 132, 136 (2nd Cir. 2024) ("HHS' deeming decision is limited in scope. It applies only to services provided to 'all patients of the [FQHC], and . . . subject to [several conditions], to individuals who are not patients of the entity'") (quoting 42 U.S.C. § 233(g)(1)(B)) (alteration in original); *see also Pediatric & Fam. Med. Found. v. Azar* ("*Azar I*"), No. 2:17-cv-00732, 2019 WL 4390563, at *4 (C.D. Cal. June 27, 2019) (" . . . [F]or an action to be within the scope of employment, it must also, with few exceptions, occur during the provision of services to health center patients") (quotation removed).

Under the FSHCAA, when a civil action is filed in state court, the Attorney General must "make an appearance in such court" within 15 days. 42 U.S.C.

---

[8] As further explained below, the federal regulations clarify that the act or omission in question also must be within the approved scope of the project. 42 C.F.R. § 6.6(d).

§ 233(l)(1).  During that appearance, the Attorney General must "advise" the state court "as to whether the [HHS] Secretary has determined" that the entity or employee "is deemed to be an employee of the [PHS] . . . with respect to the actions or omissions that are the subject of such civil action or proceeding."  *Id.*  If the Attorney General delivers an affirmative scope-of-employment certification on behalf of the Secretary, then the Attorney General must remove the case to federal court. *Blumberger*, 115 F.4th at 1119.  On the other hand, "[i]f the Attorney General fails to appear in State court within" 15 days, then the defendant may remove the case to federal court, without action by the Attorney General.  *Id.* (quoting 42 U.S.C. § 233(l)).  In a situation where an employee removes the case without action from the Attorney General, as here, the "state court is deprived of jurisdiction, and the case is stayed until the federal court 'conducts a hearing, and makes a determination, as to the appropriate forum or procedure for the assertion of the claims.'"  *Id.* (quoting 42 U.S.C. § 233(l)).

The Ninth Circuit's recent decision in *Blumberger* is instructive with respect to this procedure.  115 F.4th at 1120.  In *Blumberger*, a doctor working at California Hospital, "just blocks" from the federally funded Eisner, was alleged to have "failed to provide proper medical care" when delivering a baby.  *Id.*  The plaintiff patient filed a complaint in state court.  *Id.*  The Attorney General appeared in state court within 15 days, as required, but only notified the state court that "whether [the defendant doctor] . . . [was] deemed to be an employee of [PHS] for purposes of 42 U.S.C. § 233 with respect to actions or omissions that are the subject of the [lawsuit], [was] *under consideration*."  *Id.* (emphasis added).  The Attorney General did not remove the case, but approximately one year later amended the notice to the state court to indicate that the defendant doctor was "*not* deemed to be an employee of the [PHS] . . . with respect to the actions or omissions that are the subject of the [lawsuit]."  *Id.* (emphasis in original).

The Ninth Circuit then analyzed 42 U.S.C. § 233, examining the distinction between the terms "deemed" and "covered." *Id.* at 1128. While "deemed" refers to "whether the Secretary has determined that a qualified entity's employees have PHS status for a 'calendar year[,]'" by contrast, "covered" refers to "whether the Attorney General has determined that a PHS employee was acting within the scope of his employment 'at the time of the incident out of which the suit arose.'" *Id.* This distinction makes clear that when an Attorney General appears in state court within the 15-day deadline, the obligation at that moment is "to report on the *Secretary's* deeming decision." *Id.* at 1129. Referring to this initial report as a "a simple up-down certification[,]" making this determination "requires access to only two documents – the deeming notice issued by HHS and the complaint." *Id.* The Attorney General, however, is not required to report on their own coverage decision at that time, advising only "whether the employee was deemed a PHS employee by the [HHS] secretary for the relevant time period and was providing the categories of medical services for which he was deemed." *Id.*

As this Court has already noted, the Attorney General in the instant matter, as in *Blumberger*, failed to timely advise the state court as to the Secretary's deeming determination. (Order, Docket No. 31 at 7). The deeming notice and complaint clearly demonstrate that the HHS Secretary "approved [Defendant Eisner Health's] deeming application for calendar year 2023." (Docket No. 1 ¶ 2; Docket No. 20 at 10). Further, Plaintiffs' lawsuit arose out of conduct that is "medical" in nature during the 2023 calendar year. (Compl. ¶ 39(f)) ("…[Decedent] succumbed to her condition at approximately 11:15 p.m., approximately four hours after a C-section delivery, a devastating outcome attributed to the poor medical treatment she received"). The Attorney General should have conveyed Defendant Eisner Health's deemed status and "expeditiously" removed the case. *Blumberger*, 115 F.4th at 1139.

Whether Defendant Eisner Health had deemed status, however, is a separate question from whether the action at issue is "covered" pursuant to the Attorney

13

General's determination.[9]  *See Id.* at 1128 ("We repeat: 'deemed' and 'covered' are
different determinations made by different department heads"); *id.* at 1131 ("[Deemed
status] is a rebuttable presumption, a categorical consequence of the Secretary's
deeming decision, and is subject to the Attorney General's further inquiry"); *see also
Azar I*, 2019 WL 4390563, at *9 ("In order for a health center or its personnel to
receive FTCA coverage in a particular lawsuit, both a favorable deeming
determination and FTCA coverage decision are required . . . Being deemed a PHS
employee is a prerequisite to FTCA coverage[;] however, deeming determinations and
FTCA coverage decisions are distinct and separate processes based on criteria that do
not overlap").  As such, the parties were "free to contest" whether the Eisner
Defendants were "acting within the scope of [their] employment" by filing a "timely
motion to remand." *Blumberger*, 115 F.4th at 1140.  This is just what Plaintiffs and
the Government have done.  (Mots. to Remand, Docket Nos. 38, 43).  As further
discussed below, the Court agrees with the Government that the Eisner Defendants
were not acting within the scope of their employment.

### 2.  *Eisner Defendants Were Not Acting Within the Scope of Their Employment, Such That This Court Lacks Subject Matter Jurisdiction*

The Government argues that the Secretary's "deeming decision" does not
"conclusively establish coverage for a particular lawsuit," emphasizing that "whether
FTCA coverage is available for a particular suit" is a case-specific determination that
hinges on the circumstances in which care is provided.  (Mot. to Remand, Docket No.
38 at 3); *see also O'Brien v. United States*, 56 F.4th 139, 148-49 (1st Cir. 2022) ("We
hasten to add that the Secretary's annual 'deeming' determination does not
conclusively establish . . . FTCA coverage with respect to a particular lawsuit . . .
Rather, coverage hinges on the circumstances in which care has been provided").  To

---

[9] The Court also notes that, in the interim, in a letter dated November 24, 2024, the
Attorney General determined that the conduct did not fall within the deemed status,
such that it found FTCA coverage to be unavailable.  (Chapman Decl. ¶ 6, Exhibit F).

that end, the Government argues that the care provided in the instant matter is "not
covered conduct under [the] FSHCAA[,]" such that remand is required for lack of
subject matter jurisdiction. (Mot. to Remand, Docket No. 38 at 10-14). The Court
agrees with the Government for the reasons explained herein.

The FSHCAA's plain text establishes limitations on a health center's "deemed
status." As a preliminary matter, while the deemed status applies to services provided
to "all patients of the entity," only in limited situations does it apply to services
provided "to individuals who are not patients of the entity." 42 U.S.C. § 233(g)(1)(B).
Those limited situations include when the provision of services: "(i) benefits patients
of the entity and general populations that could be served by the entity through
community-wide intervention efforts within the communities served by such entity;
(ii) facilitates the provision of services to patients of the entity; or (iii) are otherwise
required under an employment contract (or similar arrangement) between the entity
and an officer, governing board member, employee, or contractor of the entity." *Id.*
§ 233 (g)(1)(C). The Court acknowledges that these exceptions are not the model of
clarity. The statute further states that the deeming status may not apply to "services
described in subparagraph (B)(ii)" – which are services provided to individuals who
are not patients of the entity – "unless the entity has submitted an application for such
deeming to the Secretary in such form and such manner as the Secretary shall
prescribe." *Id.* § 233(g)(1)(D). Thus, the federal regulations proscribed by the
Secretary are the appropriate source to determine when such services to nonpatients of
the entity fall within the deemed status.

The federal regulations establish what acts or omissions occur during the scope
of employment and are, thus, covered within the "deemed" status. For example, the
regulations make clear that only health center employee's actions that are "related to
grant-supported activity" of the health center will be covered. 42 C.F.R. § 6.6(d).
Nowhere, in contrast, does it state that *all* actions related to grant-supported activity

will be covered.[10]  The regulations also repeat the same language found within the FSHCAA; 42 C.F.R. § 6.6(d) states that "[a]cts and omissions related to services provided to individuals who are not patients of a covered entity will be covered only" when the Secretary determines they meet certain circumstances, as established therein. *Id.*  For such services to be covered, they must: (1) benefit patients of the entity and general population that the entity could serve; (2) facilitate the provision of services to patients of the entity; or (3) are otherwise required under an employment contract between the entity and an officer, governing board member, employee or contractor of the entity (hereafter, the "Exceptions").  42 C.F.R. § 6.6(d); *see also* 42 U.S.C. § 233(g)(1)(C).  These regulations make clear that whether the patient who received treatment from a deemed physician was a patient of the deemed entity is a critical question.[11]  *See, e.g., Kelley II*, 115 F.4th at 139-40 ("The FSHCAA makes clear that the scope of HHS' deeming decision depends on the patient's status . . . Coverage extends to nonpatients only if the treatment meets specified statutory criteria") (citing 42 U.S.C. § 233(g)(1)(B), (C)).

The regulations provide one more limitation.  The deemed status does *not* apply to a situation in which "a covered individual is providing services which are not on behalf of the covered entity," such as medical care provided "on a volunteer basis or on behalf of a third-party[,]" except when any of the Exceptions as laid out in section (d) apply.  *Id.* § 6.6(c).  The addition of this limitation highlights that arrangements

---

[10] It is for this reason that arguments focusing solely on whether the conduct in question was grant-related are insufficient; while it is a necessary condition, it is not sufficient on its own.

[11] At oral argument, Defendants seemed to contend at one point that patient status is not a necessary inquiry at all in a situation where an FQHC has a permanent health-site on its grant application.  This is not supported by the text of the FSHCAA or any case law of which the Court is aware.  *See Kelley I*, 2023 WL 2529926, at *8 (rejecting the argument that all of the FQHC's grant-supported activity falls within deemed status, as this "fail[ed] to account for the pains Congress took to distinguish between claims by existing patients [of the entity] and those asserted by individuals not previously served by the FQHC").

16

between deemed entities and any partner hospitals that go so far as to result in the provision of services being "on behalf of" anyone besides the deemed entity will not be covered, unless any of the Exceptions applies.

Because the language of the Exceptions is ambiguous, the federal regulations provide explicit examples that present situations that definitively fall within them. *See* 42 C.F.R. § 6.6(e). A particularized determination as to coverage *will be required*, unless the arrangement in question "fits squarely" in the provided examples. *See Id.* § 6.6(e)(4). The Court now addresses the nature of the services at issue.

a) <u>Decedent Was Not a Patient of Deemed Entity</u>

It is important to clarify whether Decedent is properly considered a patient of Defendant Eisner Health. As noted, the FSHCAA creates a distinction between services rendered to patients of the covered entity versus individuals who are not patients of the covered entity.

Here, because Defendant Eisner Health had deemed status for the calendar year, so did the physicians employed by Defendant Eisner Health. *Blumberger*, 115 F.4th at 1118. A physician's deemed status, however, does not imply that any patient they treat is considered a patient of the covered entity. *See Kelley II,*, 115 F.4th 140 ("Patients of a deemed entity's doctor are not necessarily patients of the entity itself"). Rather, "the FSHCAA's plain text . . . limits HHS' deeming decision to 'patients of the *entity*,' not patients of the entity's employees." *Id.* (quoting 42 U.S.C. § 233(g)(1)(B)(i)) (emphasis added).

Thus, the deemed status of the Eisner Defendants working at California Hospital does not dictate whether Decedent is properly considered a patient of Defendant Eisner Health. In fact, under the terms of the contract, these physicians working at California Hospital were explicitly *not* treating patients of Defendant Eisner Health, but of California Hospital. (Chapman Decl. ¶ 5, Exhibit E § 2.2(b)).

Plaintiffs do not allege that Decedent was ever a patient of Defendant Eisner Health. The only allegations relating to Decedent's prior care indicate that she

17

received her prenatal care at Watts Health.  (Compl. ¶ 28).  While the Eisner Defendants argue in a footnote that Decedent was a patient of Defendant Eisner Health by virtue of receiving care at a site "recognized as a health-delivery site of the [deemed] health center," no citation is provided to support this contention.[12]  (Opp'n to Mot. to Remand, Docket No. 58 at 3-4).  The Court rejects this argument, therefore, and concludes that Decedent was not a patient of Defendant Eisner Health.

The Eisner Defendants submitted evidence indicating that Watts Health center is one of eight health centers that make up the Southside Coalition of Community Health Centers ("SCCHC") – a network of FQHCs "that have joined together to better sustain, coordinate, and improve health care to the impoverished, vulnerable, publicly insured and under- and uninsured people without access to care in the South Los Angeles Region."  (Decl. of Pajmon Zarrineghbal in Supp. of Opp'n to Mot. to Remand ("Zarrineghbal Decl."), Docket No. 71-1 ¶ 8).  The Eisner Defendants' implication is that, because Decedent had been a patient of *a* deemed entity, FTCA coverage is required.

The Eisner Defendants misconstrue the text of the FSHCAA.  The question is not whether the individual was a patient of *any* deemed health center; but whether the patient was a patient of *the* deemed entity whose deemed physician provided care.  *See* 42 U.S.C. § 233(g)(1)(B)(i) (establishing coverage is afforded to "all patients of

---

[12] Defendants focused most of their oral argument on the issue of Decedent's status as a patient or a nonpatient.  Defendants renewed the argument that Decedent was a patient of Defendant Eisner Health by virtue of California Hospital being listed as a permanent health-delivery site on its grant application.  Defendants were unable to point to any case law to support this proposition, nor is the Court aware of any.  To the contrary, this interpretation diverges from the weight of authority, which suggests that a patient of the entity is an individual who received care directly from the FQHC.  *See, e.g, Kelley I*, 2023 WL 2529926, at *8 (identifying patients to be individuals that visited the FQHC before, whereas nonpatients are individuals "not previously served by the FQHC").  If Congress had intended FTCA immunity to extend to individuals who receive care at any of an FQHC's permanent health-delivery sites, it would have written the FSHCAA to reflect this.

*the* entity") (emphasis added).  Decedent was not a patient of Defendant Eisner Health, which is the dispositive question.

In *Kelley II,* a physician was employed by an FQHC.  *Kelley II*, 115 F.4th at 136.  The physician, however, was then staffed at a non-federally funded nursing facility (the "Nursing Facility") to provide medical director services on a full-time basis, though still considered an employee of the FQHC.  *Id.* at 137.  A patient under the physician's care at the Nursing Facility sued the physician for injuries sustained there, alleging medical malpractice.  *Id*.  The district court found that the conduct was not covered by the deemed status because the plaintiff was not a patient of the FQHC.  *Id.* at 138.  Furthermore, the arrangement fell outside of the enumerated examples provided by the federal regulations, and no particularized determination had been sought.  *Id.*  The Second Circuit affirmed.  *Id.* at 140.

*Kelley II* and the instant matter are indistinguishable.  Just as the plaintiff in *Kelley II* had not before been a patient at the deemed health center, Decedent was not a patient at Defendant Eisner Health.[13]  Nowhere do Plaintiffs allege Burks ever received care from Defendant Eisner Health in the past, such that she should be considered its patient.[14]  Rather, Decedent received her prenatal care at Watts Health and underwent the cesarean section and subsequent surgery at California Hospital.  (Compl. ¶¶ 28, 31, 39).  Though the Eisner Professionals were still considered employees of Defendant Eisner Health, they were hired to provide full-time services

---

[13] At oral argument, Defendants argued that the matter was distinguishable because here, unlike in *Kelley*, California Hospital was an approved permanent health delivery site on its grant application.  The Court in *Kelley* did not consider whether the Nursing Facility was a permanent health delivery site on its grant application when reaching its conclusion.  The Court, therefore, rejects this argument.

[14] The Government contends that even if Decedent had received care from Defendant Eisner Health in the past, this would be insufficient to establish the required causal connection, as the treatment at California Hospital would not have been *because* she was a patient of Defendant Eisner Health.  (Mot. to Remand at 13).  The Court need not reach this issue, as it is not alleged that she received care from Defendant Eisner Health in the past.

at California Hospital, which is not an entity with deemed status.  As patient or nonpatient status is determined not by the treating physician, but by where the care was received, the Court concludes that Decedent was not a patient for purposes of the FSHCAA, just as the court in *Kelley II*.

Furthermore, the contractor agreement between Defendant Eisner Health and California Hospital – which was similar to the one at issue in *Kelley II* – demonstrates that Defendant Eisner Health was staffing California Hospital for the benefit of California Hospital and *its* patients.  (Chapman Decl. ¶ 5, Exhibit E § 2.2(b)).  This implies that the care provided to patients under this agreement by Eisner Professionals is more aptly considered services provided on behalf of California Hospital, a third party, rather than on behalf of Defendant Eisner Health, the deemed entity.[15]  The Court finds that the specific arrangement between Defendant Eisner Health and California Hospital lends additional support for the conclusion that Decedent cannot be considered a patient of Defendant Eisner Health.  As Decedent's treatment is more aptly characterized as treatment of a nonpatient – and on behalf of a third party, California Hospital – the Court now turns to whether the care provided to her fits squarely in the examples provided by the federal regulations, such that no particularized determination was needed.  *See* 42 C.F.R §§ 6.6(d), 6.6(e).  This was the conclusion reached by the court in *Kelley II*, and it is the same conclusion reached by this Court.

---

[15] The fact that California Hospital was to pay Defendant Eisner Health up to $1,149,750 per year for the coverage services – funds entirely separate from Defendant Eisner Health's grant – further supports that the services were provided on behalf of California Hospital for *its* patients, rather than on behalf of Defendant Eisner Health.  (*Id.* § Ex. 5.1(a)); *see also Thomas*, 2019 WL 6039976, at *5 (finding that the agreement requiring that employees of the FQHC provide 24/7 coverage at a hospital – at the hospital's cost – rendered the individual treated at the hospital a nonpatient of the of the FQHC).

1          b) <u>Defendant Eisner Health Was Required to Seek a Particularized</u>

2              <u>Determination of Coverage</u>

3          As noted, the regulations provide specific examples of situations in which a

4   deemed entity's provision of care to nonpatients or on behalf of a third party meets the

5   limited instances where coverage is explicitly extended, making clear that "if the

6   activity or arrangement in question fits squarely within these descriptions[,]" then no

7   particularized coverage determination is necessary. *Id.* § 6.6(e). "[O]therwise, the

8   health center should seek a particularized determination of coverage." *Id.*; *see Azar I*,

9   2019 WL 4390563, at *4 ("The regulations further provide that unless 'the activity or

10  arrangement in question fits squarely within these descriptions . . . the health center

11  should seek a particularized determination of coverage'") (quoting 42 C.F.R.

12  § 6.6(e)(4)); *see also O'Brien*, 56 F.4th at 149 (describing that the FTCA coverage

13  applies to the provision of services to a nonpatient only if either particularized

14  determination of coverage is sought or the situation fits squarely into the scenarios

15  described in the regulations); *see also Bray v. Bon Secours Mercy Health, et al.,* 97

16  F.4th 403, 407 (6th Cir. 2024) (same); *Thomas*, 2019 WL 6039976, at *5

17  ("Defendants have not indicated that they applied for a particularized determination.

18  Thus, they must prove that the treatment of [the patient] squarely fits into an example

19  provided by § 6.6(e)").  Because the examples are limited, this implies that a

20  particularized determination of coverage is required in many situations in which care

21  is provided to individuals who are not patients of the entity or whose care is provided

22  on behalf of a third-party.

23          With respect to "hospital-related activities," the example provided in the

24  regulations is a situation in which "[p]eriodic hospital calls or hospital emergency

25  room coverage is required by the hospital as a condition for obtaining hospital

26  admitting privileges." *Id.* § 6.6(e)(4)(ii).  In that case, "[t]here must also be

27  documentation for the particular health care provider that this coverage is a condition

28  of employment at the [deemed] health center." *Id.*

21

1    Thus, the question is whether the arrangement between Defendant Eisner

2  Health and California Hospital matches the one described above.  If not, Defendant

3  Eisner Health was required to seek a particularized determination as to whether the

4  activities in question fall within the coverage of the deemed status.  *Id.* § 6.6(e)(4);

5  *Kelley II*, 115 F.4th at 136-37 (". . . [I]f the center's employees provide medical

6  services to nonpatients that do not 'fit [] squarely' within the examples listed in

7  Section 6.6(e)(4) of HHS' regulations, then the center must seek a 'particularized

8  determination of coverage' from HHS") (quoting 42 C.F.R. § 6.6(e)(4)).

9    The Court, therefore, turns to the nature of the relationship between Defendant

10  Eisner Health and California Hospital and finds that the arrangement does not

11  "squarely fit" the example of acceptable hospital-related activity not requiring of a

12  particularized determination.  California Hospital entered into an agreement in 2022

13  with Defendant Eisner Health, with Defendant Eisner Health acting as an independent

14  contractor.  (Chapman Decl. ¶ 5, Exhibit E §§ 2.2, 4.2).  Much of their arrangement

15  has to do with California Hospital's Laborist Program, which ensures staffing and

16  coordination of OB/GYN services to California Hospital patients either whose

17  attending physician is unavailable to respond in time for delivery or who do not have

18  an attending physician already at California Hospital.  (*Id.* ¶ 5, Exhibit E

19  § Recitals(D)).

20    The contract establishes "appropriate and effective means" to facilitate and

21  administer California Hospital's OB/GYN training and programming, "ensure

22  efficient operation" of California Hospital's other departments and services, ensure

23  OB/GYN services are available for California Hospital patients, reduce disruptions in

24  California Hospital's operations and "promote participation" in its educational

25  programs.  (*Id.* ¶ 5, Exhibit E § Recitals(G)).

26    The Eisner Professionals were to work at California Hospital and provide

27  treatment to patients in the Laborist Program.  (*Id.* ¶ 5, Exhibit E § 2.2(b)).  To that

28  end, Defendant Eisner Health was expected to provide its physicians "to be on-site on

a 24 hours per day, 7 days per week, 365 days per year basis to be available to provide obstetrics and gynecology services and related medical care and treatment . . . (the "*Coverage Services*"), upon the terms and subject to the conditions set forth in this Agreement." (*Id.* ¶ 5, Exhibit E § 2.2(a)). The Eisner Professionals were expected to "dedicate substantially all of their respective professional efforts as Eisner Professionals to the provision of services at [California Hospital]." (*Id.*). Significantly, in exchange for running the Labor Department, Defendant Eisner Health did not seek the right to refer Eisner patients to California Hospital; rather, the contract explicitly states that it does not "contemplate[] or require[] the admission or referral of any patients . . ." (*Id.* ¶ 5, Exhibit 5 § 4.3(a)).

All Eisner Professionals were expected to use California Hospital's electronic health record system, follow all California Hospital rules and bylaws and comply with its standards and protocols. (*Id.* ¶ 5 & Exhibit E §§ 2.9, 2.11, 2.11, 2.14). All records were to remain the "sole property of [California Hospital]." (*Id.* ¶ 5, Exhibit E § 2.9). An Eisner Professional was required to serve as the Medical Director of the Laborist Program, similarly expected to perform her services "in accordance with [California Hospital] Rules" and the "Medical Staff Bylaws[.]" (*Id.* ¶ 5, Exhibit E § 2.6).

In addition, the contract goes beyond the provision of OB/GYN services. Defendant Eisner Health was also required to operate California Hospitals' residency program, in which new doctors are trained. (*Id.* ¶ 5, Exhibit E at Exhibit 2.7). More specifically, Defendant Eisner Health was required to supervise the residents, provide teaching services and perform evaluations. (*Id.*).

Here, the arrangement between Defendant Eisner Health and California Hospital bears little resemblance to the example provided in the federal regulations. See 42 C.F.R. § 6.6(e)(4). For one, rather than periodic calls or intermittent hospital staffing, the service requirements under the contract demand coverage by Eisner Professionals around the clock, 365 days per year. The Eisner Professionals were treating California Hospital's patients, following California Hospital's rules and

regulations and running California Hospital's residency program.  Even assuming,
*arguendo*, that the scope of Defendant Eisner Health's services did not far exceed the
limited support arrangement described in the federal regulations, the arrangement was
not "required by the hospital as a condition for obtaining hospital admitting
privileges."  42 C.F.R. § 6.6(e)(4)(ii).

Defendants Velasco and Lurvey submitted declarations stating that as a
condition of their employment they were "required to maintain clinical privileges at
California Hospital" and "required to participate in [Defendant Eisner Health's] call
panel with California Hospital for the provision of hospital-based and emergency
obstetrical and gynecological care."  (Decl. of Nathana Lurvey, M.D., in Supp. of
Opp'n to Mot. to Remand ("Lurvey Decl."), Docket No. 71-2 ¶¶ 12-13; Decl. of
Penelope Velasco, M.D., in Supp. of Opp'n to Mot. to Remand ("Velasco Decl."),
Docket No. 71-3 ¶¶ 11-12).  This is a necessary condition, but not sufficient on its
own.  Because the arrangement was not for the Eisner Defendants to provide *periodic*
calls and coverage as a *condition* of obtaining admitting privileges, the argument fails.
*See* 42 C.F.R. § 6.6(e)(4)(ii).

It was mandatory, therefore, for Defendant Eisner Health to have sought a
particularized determination, as its hospital-related services did not "squarely fit"
within the example provided.  *See, e.g., Thomas*, 2019 WL 6039976, at *4-5
(remanding to state court where the health center's contract for employee to provide
24/7 coverage at a hospital was not an arrangement that "squarely fits" into
regulation's examples).  The Eisner Defendants have made no indication that any such
determination was applied for or affirmatively received.  To the contrary, a letter
dated November 14, 2024 – in which the United States Attorney's Office indicated it
would not be substituting itself as a defendant in this action[16] – indicates that
Defendant Eisner Health was specifically notified of the need for a particularized

---

[16] The Attorney General's non-certification decision is not "'incontrovertible,'" and
may be reviewed by district courts, as here.  *Thomas,* 2019 WL 6039976, at *2.

1  determination, and advised how to do so since 2014, yet failed to take any action.

2  (Chapman Decl. ¶ 6, Exhibit F at 2-3).

3      Significantly, the Eisner Defendants failed to address the "core arguments" put

4  forth by the Government regarding the limitations of the FTCA protection, as set forth

5  by the FSHCAA. [17]  (Reply, Docket No. 70).  Instead, the Eisner Defendants'

6  argument focuses almost entirely on the fact that California Hospital was an

7  "approved service site," as more thoroughly elaborated on below.  (Opp'n to Mot. to

8  Remand, Docket No. 58 at 1).  "[I]n most circumstances, failure to respond in an

9  opposition brief to an argument put forward in an opening brief constitutes waiver or

10 abandonment in regard to the uncontested issue."  *Stichting Pensioenfonds ABP v.*

11 *Countrywide Fin. Corp.*, 802 F.Supp.2d 1125, 1132 (C.D. Cal. 2011) (citations and

12 quotations omitted); *see also Kroeger v. Vertex Aerospace LLC*, 2020 WL 3546086, at

13 *8 (C.D. Cal. June 30, 2020) (collecting cases holding that party conceded argument

14 by failing to address it in opposition brief).  As the Eisner Defendants fail to directly

15 address these points regarding the requirement to seek a particularized determination,

16 the Court considers them conceded.[18]

---

[17] Furthermore, the Eisner Defendants misstate the standard required to demonstrate that the Eisner Defendants actions were arising out of their employment.  (Opp'n to Mot. to Remand, Docket No. 58 at 12).  The Eisner Defendants' argument focuses on "scope of employment" in the context of the *respondeat superior* doctrine, which is not at issue here.  (*Id.*).  Rather, the question turns on whether, within the context of the limitations placed on FTCA coverage by the FSHCAA, the Eisner Defendants treatment of Decedent meets the statutory definition of conduct taking place within the scope of employment.  42 U.S.C. § 233(g), (a).

[18] The Court highlights the Eisner Defendants are no strangers to the particularized determination process or its requirement.  In 2019, Eisner Pediatric and Family Medical Center brought a suit against the Secretary of the HHS under the Administrative Procedure Act for (1) its decision to remove California Hospital as a permanent health service site and (2) for "promulgation and implementation of its particularized determination process."  *Azar I*, 2019 WL 4390563, at *2.  In particular, Eisner Pediatric and Family Medical Center had argued that the "final and binding deeming determinations" it received should "preclude it from having to seek a particularized determination."  *Azar II*, 2020 WL 3213833, at *5.  The district court disagreed, ruling against Defendant Eisner Health with respect to both claims on a motion for summary judgment.  *Id.* at *7.  Though ultimately finding that Defendant

1

2

c) <u>The Eisner Defendants' Arguments Regarding California Hospital as
an Approved Service Site Are Necessary but Insufficient</u>

3    To demonstrate that the conduct in question occurred during the scope of

4    employment, the Eisner Defendants argue that they "were doing precisely what

5    [Defendant Eisner Health] hired them to do," which was to "perform labor and

6    delivery services at California Hospital." (Opp'n to Mot. to Remand, Docket No. 58

7    at 12). In other words, because the Eisner Defendants were providing "OB/GYN and

8    related services on behalf of [Defendant Eisner Health] at California Hospital," the

9    Eisner Defendants argue that this "reflects and confirms that the Eisner Defendants

10   were acting on behalf of [Defendant Eisner Health] with respect to the Complaint."

11   (*Id.*). The Court finds that this argument is both circular and overly reductive. The

12   fact that the Eisner Defendants were specifically hired to work at California Hospital's

13   Laborist Program does not address the threshold issue of whether the arrangement

14   between California Hospital and Defendant Eisner Health was covered by Defendant

15   Eisner Health's deemed status. If anything, the fact that the Eisner Defendants were

16   hired, essentially, *solely* to work at California Hospital makes it less likely that such

17   conduct would be considered to fall within Defendant Eisner Health's deemed status;

18

19   Eisner Health lacked standing to challenge the particularized determination process –

20   because it was "undisputed that Plaintiff never filed a particularized determination[,]"
     such that there was no concrete injury – the court provided further analysis. *Id.* at *6.

21   The court found that "the deeming determination and the particularized determination
     can coexist because they are separate processes that reach different determinations

22   based on different criteria." *Id.* While the "deeming determination provides one
     swath of coverage in certain, delineated circumstances[,]" a particularized

23   determination must be sought to get "coverage outside that swath of approved
     circumstances." *Id.* The Ninth Circuit eventually reversed with respect to the

24   Secretary's removal of California Hospital as a service site – finding the Secretary's
     decision to have been arbitrary and capricious – but it affirmed with respect to the

25   district court's findings regarding the particularized determination process. *Pediatric
     & Fam. Med. Found. v. Becerra* ("*Becerra*"), No. 2:17-cv-00732, 2021 WL 3878647,

26   at *1 (9th Cir. Aug. 31, 2021). At oral argument, Defendants stated that they had not
     sought a particularized determination because it would be conceding that they were

27   required to but had failed to do so in the past. This argument makes sense in the
     context of this litigation history, but it does not save their arguments here.

28

26

unlike an arrangement in which a deemed center provides periodic or limited coverage – such as the one approved of in the federal regulations' examples – this arrangement required the dedication of "substantially all of their respective professional efforts as Eisner Professionals to the provision of services at [California Hospital]." (Chapman Decl. ¶ 5, Exhibit E § 2.4(a)). Thus, the fact that the Eisner Defendants were hired by Defendant Eisner Health specifically to work at California Hospital – a third-party not covered by a federal grant – supports the conclusion that their conduct falls outside of the Eisner Defendants' deemed status and, consequently, FTCA coverage. *See, e.g., Thomas*, 2019 WL 6039976, at *5 (concluding that where the FQHC physician was hired to work solely at a separate hospital without deemed status, FTCA coverage did not apply to her treatment of a patient at the hospital).

The Eisner Defendants next argue that their agreement with California Hospital must fall within their deemed status because "[Defendant Eisner Health's] grant-related activities include 'the performance of medical, surgical, dental, or related functions within the scope of the approved Federal section 330 grant project, which includes sites, services, and other activities or locations, as defined in the covered entity's grant application and any subsequently approved change in scope requests. '" (Opp'n to Mot. to Remand, Docket No. 58 at 13). Put simply, they argue that because the Health Resources and Service Administration ("HRSA") "approved [Defendant Eisner Health's] OB/GYN service delivery site and call-panel activities at California Hospital" through a 2008 "change in scope request," that the activities there inherently fall within Defendant Eisner Health's deemed status and, consequently, FTCA coverage. (*Id.*). The Government states that this reasoning is flawed because "it confuses a single necessary condition (an approved service site) for the end result (FTCA protection)." (Reply, Docket No. 70 at 8). The Court agrees with the Government.

A "change in scope" request is when a grant recipient seeks to expand the services they intend to be covered by the grant, which must be approved of by HHS.

(Opp'n to Mot. to Remand, Docket No. 58 at 8; *see also* Change of Scope Request,

Docket No. 58-4, Exhibit D).  A change of scope request, however, only relates to the

scope of grant-related activities, which is a separate question from whether the

conduct in question is covered under the FTCA.  *See, e.g., Becerra*, 2021 WL

3878647, at *2 ("FTCA coverage under the [FSHCAA], and the scope of a grant

funded under the [PHSA], are two separate issues").  To the extent that the Eisner

Defendants seek to argue that a change in scope request is the *same* as a particularized

determination under the FSHCAA's federal regulations, the Court declines to find that

these are the same.  The Ninth Circuit has already rejected this argument.  *See id.*  As

already stated, there is no guarantee that *all* grant-related activities are covered;

therefore, a change of scope request, as it relates to only to the scope of the project,

necessarily cannot be the same as a particularized determination of FTCA coverage.

While "only acts and omissions related to the grant-supported activity of entities are

covered," this does not mean that *all* grant-supported activities will be covered.  *See*

42 C.F.R. § 6.6(d).

　　　　The Government highlights that the "HHS has long informed health centers of

the fact that a location's approval as a service site does not necessarily equate to

FTCA protection."  (Reply, Docket No. 70 at 8).  Rather, the HHS makes clear that

"[w]hile identification as a service site within a scope of project is required for

participation in the FTCA . . . it is not a guarantee that these benefits will be realized."

*See* Dep't of Health and Human Servs., Health Resources and Servs. Administration,

*Policy Information Notice*, "Defining Scope of Project and Policy for Requesting

Changes," (PIN No. 2008-01, Jan. 13, 2009) at 4.  The HHS goes on to state that

"identification as a service site within a scope of project is necessary, but not

sufficient, to ensure participation in other programs[,]" which includes FTCA

coverage.  (*Id.*).  California Hospital's approval as a service site does not mean that

the arrangement falls within Defendant Eisner Health's deemed status.

1    Furthermore, HHS explicitly rejected that service site approval necessarily

2    implies FTCA coverage when 42 C.F.R. § 6.6 was amended in 2013.  Several

3    commentators asked the agency to establish a "presumption of FTCA coverage for all

4    services within an approved scope of project."  78 Fed. Reg. 58202 (Sept. 23, 2013),

5    https://www.federalregister.gov/documents/2013/09/23/2013-22993/federal-tort-

6    claims-act-ftca-medical-malpractice-program-regulations-clarification-of-ftca-

7    coverage.  HHS declined to establish that presumption, stating that "the

8    FSHCAA . . . does not expressly confer authority on the Secretary to extend such a

9    presumption, and the addition of such a presumption introduces novel legal issues that

10   were not intended by, and have not fully been addressed by, this rulemaking process.

11   *Id.*  Thus, the Court agrees with the Government that "while it is necessary for the

12   Eisner Defendants to demonstrate that services were provided at an approved service

13   site for those services to be potentially within [Defendant Eisner Health's] grant, this

14   alone does not automatically translate to deemed status or FTCA coverage."  (Reply,

15   Docket No 70 at 10).  Therefore, as the bulk of the Eisner Defendants' argument

16   focuses on California Hospital as an approved service site, they miss the mark.

17   The Eisner Defendants also argue that a recent Sixth Circuit decision

18   "exemplifies an analogous arrangement in which the court recognized a deemed

19   health center's OB/GYN hospital coverage activities as covered by § 233(a)

20   immunity."  (Opp'n to Mot. to Remand, Docket No. 58 at 16); *see Bray*, 97 F.4th at

21   414.  They contend that the holding in *Bray* supports the conclusion that the conduct

22   at issue here falls within the scope of Defendant Eisner Health's deemed status.  The

23   Court disagrees.

24   In *Bray*, a doctor failed to diagnose a pregnant woman with preeclampsia.

25   *Bray*, 97 F.4th at 407.  Though the doctor was employed by a "covered community

26   health center under the FSHCAA," the incident in question occurred while the

27   physician was working at the defendant hospital.  *Id.* at 408.  The physician's contract

28   with the FQHC included providing periodic overnight and weekend OB/GYN

29

coverage. *Id.* Though the FQHC's grant application did not specifically list the
defendant hospital as a site in its application, the application did "explicitly
contemplate" that the covered health center would "admit and see patients at local
hospitals." *Id.* at 409. The court made clear that the issue at hand was whether the
arrangement between the covered health center and the defendant hospital "falls
squarely within § 6.6(e)(4)(ii)," such that no particularized determination would have
been required to be sought in advance. *Id.* at 413-14. The district court had
determined that the arrangement *did* squarely fit into the example provided in the
federal regulations – where the coverage was periodic and required by the hospital as
a condition for obtaining hospital admitting privileges, and such requirement was
documented. *Id.* at 414. The Sixth Circuit affirmed, finding that district court had
properly determined that the "'arrangement'" between the covered health center,
defendant hospital and physician "fit 'squarely within' the circumstance set out in
§ 6.6(e)(4)(ii)." *Id.*

As the Government highlights, "the contract between [Defendant Eisner Health]
and [California Hospital] is not for '[p]eriodic hospital call or hospital emergency
room coverage,' or 'required by the hospital as a condition for obtaining hospital
admitting privileges.' 42 C.F.R. § 6.6(e)(4)(ii)." (Reply, Docket No. 70 at 4). This is
a crucial distinction and one that the Eisner Defendants do not convincingly address.[19]

---

[19] The Eisner Defendants focus, instead, on a separate issue addressed by the court in
*Bray*, which was whether HHS had been adequately on notice of the covered health
center's intentions to provide services at the defendant hospital, despite the hospital
not being mentioned by name in the grant application. *Id.* at 410-13. In other words,
the inquiry there was whether the conduct was sufficiently grant-related. The court in
*Bray* concluded that the defendant hospital need not have been named in the
application specifically in order that the conduct be considered related to grant-
supported activity. *Id.* at 412-13. The Eisner Defendants' citations to *Friedenberg v.
Lane Cnty.* similarly focus on the limits of what is considered grant-funded activity
under the FSHCAA. 68 F.4th 1113 (9th Cir. 2023). But that is not the issue before
the Court now, as there has been no contention that the conduct was outside the scope
of grant-funded activity. The fact that the conduct is related to grant-supported
activity is a necessary, but not a sufficient, condition for FTCA coverage, as stated
above.

1   Because Defendant Eisner Health's arrangement with California Hospital does not

2   squarely fit with the arrangement described in the federal regulations, a particularized

3   determination of coverage was necessary.  42 C.F.R. § 6.6(e)(4).  This threshold issue

4   cannot be ignored.

5       The Eisner Defendants also cite to *Thomas*, attempting to distinguish the instant

6   matter.  *Thomas*, 2019 WL 6039976.  In *Thomas*, the employee of an FQHC provided

7   care to a patient at the defendant hospital, where he later died.  *Id.* at *1.  Though the

8   FQHC was providing primary health care services at fifteen locations in the area, the

9   defendant hospital in question was not one of them.  *Id.*  Rather, the FQHC had a

10  separate arrangement with the defendant hospital, which required the provision of

11  physicians "'twenty-four hours a day, seven days a week.'"  *Id.*  The Attorney General

12  ultimately did not certify the conduct as covered, finding that 1) the activity was not

13  grant-related; 2) the patient was not a patient of the covered entity; and 3) the

14  arrangement did not fall within one of the limited exceptions extending FTCA

15  coverage to nonpatients.  *Id.* at *3.  The district court agreed, concluding that the

16  defendants failed to carry their burden to demonstrate that the activity was grant-

17  related, the patient was a patient of the covered entity or that the arrangement

18  "squarely fits" within an example in the federal regulations.  *Id.* at *5.

19      Here, the Eisner Defendants argue that because the California Hospital *was* an

20  included service site in its grant application, unlike in *Thomas*, that this means the

21  conduct must be covered.  This, however, continues to fail to address the crucial issue:

22  where Decedent was a patient of California Hospital, not Defendant Eisner Health,

23  and the arrangement in question did not fall squarely into the example provided by the

24  federal regulations, a particularized determination was required.  This was the same

25  conclusion reached in *Thomas*, and it is the conclusion here in the instant matter.

26

27

28

1    d) <u>Public Policy Explains Why FTCA Coverage Does Not Extend Here</u>

2    The Court now briefly addresses policy rationales that explain why the FTCA

3    coverage does not automatically extend to all grant-funded activities, including in the

4    instant matter. *Blumberger*, once again, is instructive. *See* 115 F.4th at 1128.

5    First, the Ninth Circuit explained that "[t]he logic of the statute depends on

6    policing the boundaries between the Secretary's deeming decision and the Attorney

7    General's coverage determination." *Id.* "The Secretary makes the ex-ante deeming

8    decision by relying on his public health expertise; the Attorney General makes the ex-

9    post scope-of-employment certification by relying on his experience defending the

10   United States's interests in court." *Id.* To that end, the Ninth Circuit emphasized that

11   "[t]he division of labor that Congress has made between the Secretary (who

12   determines an entity's deemed status) and the Attorney General (who determines an

13   employee's coverage status) reflects the unique expertise of the two actors." *Id.*

14   Approving a deeming application requires the Secretary to "'review[] and

15   verif[y] professional credentials, references, claims history, fitness professional

16   review organization findings, and license status of its physicians and other licensed or

17   certified health care practitioners,'" as well as "ensure the entity 'has implemented

18   appropriate policies and procedures to reduce the risk of malpractice[.]'" *Id.* (quoting

19   42 U.S.C. § 233(h)(2), (1)). In other words, after assessing an entity's professional

20   credentials, policies and procedures, the Secretary determines whether it would be a

21   good candidate to be deemed a federal employee.[20] The Secretary's overarching

22

23   _____

     [20] Where Defendant Eisner Health's arrangement resulted in Eisner Professionals
24   working 24/7 at California Hospital, it is clear why the deeming decision does not
     extend to them. The Secretary's deeming decision is tied to its assessment of
25   Defendant Eisner Health as an entity. Where the Eisner Professionals were staffed
     full-time at California Hospital and required to abide by its policies and procedures,
26   they essentially acted as employees of California Health, despite their technical
     employment status. The Government has no incentive to waive its sovereign
27   immunity on behalf of a *hospital* that the Secretary never explicitly reviewed under its
     deeming decision.
28

objective, of course, is to advance the health and well-being of the nation, which
suggests an incentive to increase the scope of these grants.

By contrast, the Attorney General is "charged with vindicating the interests of
the United States in court and defending the public fisc[.]" *Id.* Where the Attorney
General is "intimately familiar with the legal doctrine governing scope of employment
in tort cases[,]" they are in the best position to understand when the Government must
substitute itself in any given situation. *Id.* The Attorney General is, unsurprisingly,
incentivized to protect the financial and legal interests of the Government and
minimize its liability.

Common sense explains why these different actors possess distinct, yet
complementary roles. The Attorney General and the Secretary, respectively, are
motivated by distinct objectives and concerns, in addition to having different
expertise. Were the Secretary's deeming decisions to apply to all grant-funded
activity, they might be disincentivized from expanding such grants due to the
associated expansion of the Government's liability that could accompany. The
Attorney General's role allows for the Secretary to focus on expanding access to
health services, without automatically expanding the Government's liability.
Therefore Defendant Eisner Health's change of scope request in 2008 was approved
does not bear on whether or not FTCA coverage applies. They are different
considerations made by separate actors with distinct incentives.

Furthermore, there is a simple solution to the problem Defendant Eisner Health
faces, along with other similarly situated FQHCs. As made explicit in the federal
regulations, an FQHC need only seek a particularized determination as to coverage.
That Defendant Eisner Health failed to do so with respect to its arrangement with
California Hospital was avoidable.

In short, the Court agrees with the Government's conclusion that the conduct in
question did not fall within the scope of employment for purposes of FTCA coverage,
given the limitations imposed by the FSHCAA. "Should a United States district court

determine on a hearing on a motion to remand held before a trial on the merit that the case so removed is one in which a remedy by suit . . . is not available against the United States, the case shall be remanded to the State Court." 42 U.S.C. § 233(c). The Court finds that FSHCAA does not extend FTCA coverage in this scenario, such that immunity is now unavailable to the Eisner Defendants. This Court, accordingly, lacks subject matter jurisdiction. *See Kelley I,* 2023 WL 2529926, at *8 (remanding to state court pursuant to 42 U.S.C. § 233(c), upon determination that FTCA immunity did not apply and the court accordingly lacked subject jurisdiction). As such, the Court **GRANTS** the Government's Motion to Remand.

## III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Motion to Remand and **DENIES** Plaintiffs' Motion to Remand as moot. The Court, however, temporarily stays the Order to Remand. At oral argument, Defendants requested that, in the event that the Court granted the Motion to Remand, they be afforded an opportunity to move for a stay pending appeal. Should Defendants choose to file a motion to stay, they must identify the source of the Court's authority to issue such a stay, in addition to providing argument for why a stay is warranted. To that end, the Order to Remand is temporarily stayed for sixty (60) days, or until the resolution of Defendants' forthcoming motion to stay, whichever is sooner.

**IT IS SO ORDERED.**

Dated:  April 18, 2025

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE

34